Whitaker, Judge,
dissenting:
I mnst express the reasons for my dissent from the opinion and decision of the majority, because I think there has been a flagrant violation of a right of one of our citizens by his Government, which seeks to escape liability under the cloak of the immunity of a sovereign. This is a case in which this court gives sanction to bureaucratic action in violation of a right, this time a right acquired in consideration of the payment of a large sum of money to the defendant itself, who asserts the power to keep the money and to deny the right for which the money was paid. I cannot allow such a decision to go unchallenged.
One of the rights inherent in the ownership of property is the right to sell it to anyone who wishes to buy it. This right is, however, frequently restricted by statute or by contract; but, unless so restricted, it is absolute.
In 1916 Congress passed and the President approved the Shipping Act of 1916 (Act of September 7, 1916, c. 451, 89 Stat. 728). Its caption says it is:
An Act to establish a United States Shipping Board for the purpose of encouraging, developing, and creating a naval auxiliary and naval reserve and a merchant marine to meet the requirements of the commerce of the United States with its Territories and possessions and with foreign countries; to regulate carriers by water engaged in the foreign and interstate commerce of the United States; and for other purposes.
By sections 7 and 8 the Shipping Board, created by the Act, was authorized to sell or lease any vessel acquired by it. By section 9 it was required that any vessel purchased, chartered, or leased from the Board should be eligible for American registry, and should be operated only under such registry, “unless otherwise authorized by the Board.” It was also prowled, at p. 731:
* * * No such vessel, without the approval of the board, shall be transferred to a foreign registry or flag, or sold; nor, except under regulations prescribed by the board, be chartered or leased.
This section was amended several times before the transaction in question. As last amended, by the Act of June 23, *115 1938 (52 Stat. 953,964), section 9 was made to read in part as follows:
* * * it shall be unlawful, without the approval of the United States Maritime Commission, to sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, or transfer or place under foreign registry or flag, any vessel or any interest therein owned in whole or in part by a citizen of the United States and documented under the laws of the United States, or the last documentation of which was under the laws of the United States.
So that, at the time plaintiff acquired the vessel, Colonel Frederick C. Johnson, his right to sell it to anyone who wished to buy it, or to transfer it to foreign registry, was restricted by the necessity to secure the approval of the Maritime Commission, which had succeeded to the powers of the Shipping Board.
But this was the only restriction which the law placed on his right to sell it or to transfer it to foreign registry. Only the approval of the Maritime Commission had to be obtained. No other approval was required.
This being the law, the Maritime Commission advertised for bids on the Colonel Frederick C. Johnson. One of the inducements to secure bids, as set out in the invitation for them, read:
* * * The Commission will consent to the transfer of the vessel to foreign ownership, registry, and flag, pursuant to the applicable provisions of the Shipping Act, 1916, as amended, pi'ovided the transfer is made effective within (6) months fi’om the date of award and provided, further, the transferee, in the determination of the Commission, is not an alien country, or a national or nationals thereof prohibited by the Government of the United States from engaging in commercial transactions with the United States and its citizens or anyone acting on behalf or in the interest thereof. The applicant shall submit such evidence as the Commission shall deem necessary in connection with such application for transfer.
Thus the Commission, as an inducement to secure plaintiff’s bid, said it would consent to the transfer of the vessel to foreign registry, provided only the request for the transfer *116 be made in 6 months and the transferee was not an enemy country or an enemy alien.
With this inducement in mind, plaintiff offered $48,120 for the vessel. His offer was accepted, and he paid the amount on June 12,1947. In his letter transmitting the payment he said:
Kindly let me have a Bill of Sale and Certificate of Registry, and a written acknowledgment of my full right to transfer this vessel to foreign registry if I should so desire.
In reply the Maritime Commission wrote plaintiff acknowledging the check and saying:
The Commission will consent to the transfer of the vessel to foreign ownership, registry, and flag as provided in Section 8 of the subject Invitation for Bids.
Section 8 of the Invitation for Bids is set out above.
Wé have, then, an unequivocal commitment to consent to the transfer, provided only that the request for the consent be made in 6 months, and that the transferee be not an enemy country or ah enemy alien. It is agreed that the request for consent was made in 6 months and that the transferee was not an enemy country or an enemy alien. The Shipping Act plainly gave the Commission the power to make such an agreement.
This agreement was made as part consideration for the payment of $48,120. There is no question that this money would not have been offered or paid except for this agreement.
The consent was not given when it was requested. It was not given until June 80, 1948, and then only after plaintiff had satisfied additional requirements imposed by the Maritime Commission.
There can be no doubt that defendant violated its agreement, an agreement made to secure from plaintiff $48,120. As a result plaintiff has suffered considerable damage.
The only excuse offered for this breach of faith is that the State Department feared that the vessel would be used to carry Jews to Palestine in violation of the policy adopted by the British Government regulating the admission of immigrants to that country.
*117 For the purposes of this case I am not at all concerned with the propriety of the efforts of the State Department to prevent the use of an American vessel in this traffic. This is beside the issue. The issue is the sanctity of contracts, the dishonesty of the Government’s inducing payment of money to it on the faith of its agreement to do a thing it later refuses to do, and this without any offer to return the money paid, but, instead, a refusal to reimburse the payor for the damages he suffered thereby.
I cannot give my approval to such conduct.
If international politics demanded that the Maritime Commission repudiate its agreement, then justice demands that the defendant respond in damages therefor:
The majority opinion says the Maritime Commission and the State Department were exercising sovereign powers in refusing the consent. No sovereign has the power to induce the payment of money to it in consideration of a promise and then not keep the promise, or pay for the damages suffered for its failure to do so.
I respectfully dissent.
Labamobe, Judge, concurs in the above dissent.
FINDINGS 0E FACT
The court, having considered the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is and for several years has been a trader and promoter. He has dealt in real estate and construction, and has bought and sold commodities in South America, France, and China. He has never undertaken to engage in the operation of ships except in relation to the vessel which was the cause of this controversy. Plaintiff is a native-born citizen of the United States and a Jew.[1]
2. The British mandate for Palestine came to an end on May 15,1948.[2]
*118 After the capitulation of Germany in World War II there developed an increasing movement of European Jews toward Palestine. During the two years, more or less, prior to the end of the mandate, the British Government decreed and endeavored to maintain a quota limitation of 1,500 per month as the number of Jews who might enter Palestine for permanent residence. The number of Jews who sought and obtained entrance into Palestine during these years exceeded the established quotas. The British applied the term ‘‘illegal” to the evasion and violation of the quotas. Immigrants who entered Palestine without quota clearance were referred to as “illegal” immigrants, and the traffic in immigrants seeking entry into Palestine despite the quota limitations was designated “illegal” immigrant traffic.
Evidence gathered by the British Foreign Office in 1946 indicated to it that support, in money and ships, for the troublesome traffic was coming from sources in the United States. In December 1946 representations to that effect were made by the British Foreign Office to the United States. Thereafter, the problem of Jewish migration to Palestine became a matter of concern to the Department of State. Officials of the State Department responsible for discussing or dealing with the matter adopted the British terminology and referred to “illegal immigrants” and the “illegal immigrant traffic” in the same terms and with the same meaning as the British Foreign Office.[3]
3. In October 1946 plaintiff purchased from the Potomac Wrecking Company its contract with the Maritime Commission for the sale of the President Warfield. Within less than a month he sold the contract at a profit of $10,000.
4. The purchaser of the contract for the President War-field was the Weston Trading Company, a Panamanian corporation of which Captain William C. Ash was president.
Ash was a master mariner and a ship surveyor. He was also skilled in labor relations, having been active in the affairs of the union of Masters, Mates, and Pilots for several *119 years. His title as president of the Weston Trading Company was nominal. The essence of his relationship with Weston was that of employee to employer. Weston paid him a retainer in return for which he used his knowledge and skills in assisting the company in the purchase, repair, commissioning, manning, storing, clearing, and sailing of ships.
5. On February 27,1947, the Maritime Commission invited “sealed bids for the purchase of the former passenger vessel SS. Colonel Frederick C. Johnson (ex-Dewitt Clinton) * * The invitation contained the following description of the vessel:
* * * built in 1913 * * * riveted steel hull * * * one main deck and (3) joiner decks * * * length 320' 2", beam 48' 1", depth 19' 0"; of 3,899 gross tons and 2,246 net tons, and 3,000 deadweight tons * * * equipped with (2) 4 cylinder triple expansion engines, developing 4,000 I. H. P. She now has a passenger capacity of approximately 600 troops and 300 crewmen. * * *
During World War II the Army had requisitioned the Dewitt Clinton and had had it virtually rebuilt for use as a troop transport. In 1947 the vessel was a much better ship than the age of the hull would indicate.
6. The invitation for bids described in the preceding finding contained the following provision:
* * * The Commission will consent to the transfer of the vessel to foreign ownership, registry, and flag, pursuant to the applicable provisions of the Shipping Act, 1916, as amended, provided the transfer is made effective within (6) months from the date of award and provided, further, the transferee, in the determination of the Commission, is not an alien country, or a national or nationals thereof prohibited by the Government of the United States from engaging in commercial transactions with the United States, and its citizens or anyone acting on behalf or in the interest thereof. The applicant shall submit such evidence as the Commission shall deem necessary in connection with such application for transfer.[4]
*120 Am addendum to the invitation required bids to be “received before 2:15 p. m. * * * April 10,1947.”
7. On April 9, 1947, plaintiff placed with tbe Maritime Commission his bid for the Oolonel Johnson. In so doing he intended to purchase the ship for resale at a profit.
8. (a) On April 21, 1947, the British Embassy in Washington advised the Secretary of State that reliable information had been received by it that the President Warfield was destined for the illegal traffic in Jewish immigrants and that the Trade Winds and the Northland were being fitted out in Baltimore for the same purpose. The State Department took no action with respect to any of the vessels.[5]
(b) Some time in April 1947, Captain Ash severed his connection with Weston Trading Company in order to devote his full time to the affairs of the Masters, Mates and Pilots, of which he had recently been elected international vice president and local business manager.
9. On May 16, 1947, the Maritime Commission accepted plaintiff’s bid for the Oolonel Johnson.
10. On June 2, 1947, an Assistant to the Legal Adviser of the State Department conferred with the Assistant Attorney General in charge of the Criminal Division of the Department of Justice concerning “representations of the British Government regarding illegal acts in the United States which aid terroristic activities in Palestine.” The State Department representative “showed the FBI reports with respect to military training activities in New York and ships leaving our shores to carry immigrants to Palestine.” Also, according to the memorandum of conversation:
There was some discussion regarding the case of the Alabama during the Civil War, in which the United States recovered fifteen million dollars from Great Britain for its failure to prevent the departure of ships *121 from British, ports that were engaged in preying upon commerce of the Union.[6]
11. Shortly after plaintiff learned that his bid for the Colonel Johnson had been accepted, he asked Captain Ash to take charge of the delivery and commissioning of the vessel. Captain Ash at first declined, because most of his time was taken with his duties in behalf of the Masters, Mates, and Pilots. After conferring with plaintiff and examining the plans of the vessel, Ash thought he saw an opportunity for a profitable sale from which he might benefit, and agreed to serve as requested. He confirmed the arrangement between himself and plaintiff by letter dated June 5,1947.
12. On June 5, 1947, the President of the United States issued a statement urging all United States citizens to refrain from engaging in or facilitating any activities which tended to further inflame the passions of the inhabitants of Palestine, to undermine law and order in Palestine, or to promote violence in that country. State Department officials gave great weight to this decision in their further activities. This was in accord with a resolution adopted on May 15,1947, in the General Assembly of the United Nations.
13. On June 6,1947, plaintiff entered into a written agreement with three other persons whereby the four of them comprised a syndicate to finance the purchase and resale of the Colonel Johnson. The agreement called for the contribution of a total of $60,000 ($45,000, or 75 percent by plaintiff; $6,000, or 10 percent, by each of the two others; and $3,000, or 5 percent by the fourth member) and for distribution of the profits from the resale of the vessel in proportion to the parties’ respective contributions to the fund. ... .
Several months later, after plaintiff’s plans for the disposition of the vessel had been changed, he bought up, the *122 interests of tbe two $6,OOO-syndicate participants by paying them $9,000 each.[7]
14. On June 12,1947, plaintiff paid to the Maritime Commission $48,120, which sum the Commission accepted in full payment for the vessel. In his forwarding letter, plaintiff asked:
Kindly let me have a Bill of Sale and Certificate of Registry, and a written acknowledgment of my full right to transfer this vessel to foreign registry if I should so desire.
Within a week the Maritime Commission acknowledged receipt of the check and added:
The Commission will consent to the transfer of the vessel to foreign ownership, registry, and flag as provided in Section 8 of the subject Invitation for Bids.
15. Captain Ash had impressed upon plaintiff the importance of the provision for transfer to foreign registry.[8] At the suggestion of Captain Ash, plaintiff organized a Panamanian corporation, the Brownsam Company, of which he was the sole owner, to facilitate obtaining a Panamanian flag for the vessel.
16. (a) By letter dated June 16,1947, directed to Captain R. W. Weiss, District Manager of Alcoa Steamship Company at Norfolk, Captain Ash confirmed the arrangements previously made between them by telephone for the delivery, moving, and berthing of the Colonel Johnson.
(b) Before the vessel was delivered to plaintiff he authorized a New York ship broker to sell it at a price which would net plaintiff $125,000.
(c) On June 19,1947, the vessel was delivered to Captain Weiss by the Maritime Commission, which thereafter certified that title and ownership had been transferred to plaintiff on May 20,1947.
*123 (d) Captain Ash examined the vessel at Norfolk and concluded that, subject to confirmation by more detailed scrutiny, the vessel was in good condition and that with a relatively small expenditure the vessel could be used or sold at a handsome profit. He so advised plaintiff.
(e) On June 24,1947, plaintiff sent the following telegram to Captain Weiss:
I hereby authorize you to negotiate for the sale of the * * * Colonel * * * Johnson at a price of $300,000 where is and as is final sale and terms subject to my approval.
(f) By the middle of July 1947, plaintiff had received tentative offers (subject to examination of the vessel and negotiation of terms) of $175,000, $225,000, and two at $300,000.
(g) Within a few weeks after delivery of the vessel plaintiff concluded that it could be sold at a profit substantial enough to warrant holding the investment for six months, in order that he might list the profit on his income tax return as a long-term capital gain.
17. On July 18, 1947, the President 'War-field, renamed the Exodus was captured by the British, off Haifa carrying approximately 5,000 nonquota Jewish immigrants. British authorities lost no time in communicating to American officials pointed (albeit diplomatic) advices to the effect that “we told you so.”[9]
18. On July 28, 1947, the Colonel Johnson was placed in drydock and examined by the resident surveyor of the French classification society, Bureau Veritas. The surveyor condemned one tail shaft and directed that it be replaced. The vessel was moved from drydock to anchorage pending receipt of the shaft, which had to be made to order.
In the meantime plaintiff, with the concurrence and participation of Captain Ash, was negotiating with the Trinidad *124 firm of Coelho and Abraham for a venture whereby the Colonel Johnson would be used to transport a capacity load of passengers from West Indies ports to the Orient. Simultaneously, plaintiff was negotiating with Chinese connections for the possible sale of the vessel to Chinese interests. He contemplated the possibility of the sale at the conclusion of the West Indian venture. Plaintiff and Captain Ash then expected the vessel to be ready to sail during the latter part of September 1947.
19. On August 7, 1947, the Secretary of State wrote the British Minister of Foreign Affairs to the effect that the United States would endeavor to see that no ships owned by the American Government were thereafter sold to persons whose activities provided ground for belief that the ship would be used for the purpose of transporting illegal immigrants to Palestine.[10]
20. Thereafter, the British Embassy employed American counsel to assist in developing information relating to activities by Americans in opposition to the blockade of Palestine. British suspicions of various activities were then communicated to the State Department with increasing frequency. [Representations were made to the Secretary of State and the American Ambassador in London by the Minister of Foreign Affairs and the British Ambassador in Washington, and the First Secretary of the British Embassy in Washington was in constant touch with various officials of the State Department. The representations became more and more specific.
21. On October 2,1947, an official of the State Department recorded the substance of a conversation had with Mr. Brom-ley, First Secretary of the British Embassy. A portion of the memorandum follows:
Mr. Bromley stated that the British Embassy received an anonymous telephone call, which another source tends to substantiate, concerning the possibility that an *125 American vessel known as the SS. Col. Frederick_ G. Johnson is being refitted with the intention of being used to carry illegal immigrants to Palestine.[11]
Afterward, the British Embassy apprised the State Department (1) that the Exodus 19If/ was the former President Warfield; (2) that the President Warfield had been outfitted by the Weston Trading Company; (3) that Captain Ash was president of the Weston Trading Company; (4) that plaintiff had sold the President Warfield to Weston; and (5) that Ash was employed by plaintiff in connection with the Oolonel Johnson. It was also pointed out that both the Warfield and the Johnson had been serviced in Norfolk by the Alcoa Steamship Company.
22. Plaintiff was in Colombia, South America, from sometime in July or August 1947, until the early part of October. The repairs to the Oolonel Johnson had not been completed upon his return. Meanwhile, negotiations relative to the West Indies-Orient venture lagged and ultimately collapsed.
Early in October, negotiations for the sale of the vessel to the Government of Holland were opened with plaintiff’s son-in-law, in New York, by Dr. Isadore Kahn, a citizen of Holland, who was then in New York. Dr. Kahn was the owner of a chain of theatres in Holland. His son, Hans, had served with the Dutch and British navies during World War n. The price of the vessel tentatively fixed in these negotiations was $350,000. The Government of Holland ultimately withdrew its interest in the transaction. Lengthy negotiations followed between plaintiff and the Kahns, father and son, looking toward an involved transaction combining features of sale and charter, the objective of which was the sale of the vessel by plaintiff and its operation and ultimate acquisition by Hans Kahn.
On October 17, 1947, plaintiff offered to sell the vessel to an American corporation representing Syrian interests in the export-import trade. The quoted price was $350,000.
23. (a) On October 18,1947, the British Ambassador wrote to the Secretary of State asking, in substance, that all possible steps be taken to insure that the Oolonel Johnson not *126 be allowed to sail until her bona fides had been thoroughly established.[12]
(b) At about this time (late October 1947) the Secretary of State informally advised Jewish leaders in the United States that unless the clandestine activity in opposition to the British blockade of Palestine was stopped, he would have to treat the matter publicly.
(c) Inasmuch as the Secretary’s representations to Jewish leaders were off-the-record, and since some time would be required to determine their effectiveness, officials of the State Department responsible for implementing departmental policy relating to the “clandestine activity” (into which they lumped plaintiff, Captain Ash, and the Colonel Johnson) concluded that their actions should be clothed in secrecy as far as possible during the waiting period; otherwise there might be a violation of the pledge, implicit in the Secretary’s representations, to withhold publicity until the Jewish leaders could have an opportunity to see what they could do.
24. On October 22,1947, plaintiff’s attorney forwarded to the Maritime Commission plaintiff’s application for the transfer of the Colonel Johnson to Panamanian registry and flag, and its sale to the Brownsam Company.[13]
25. By the time plaintiff’s application for transfer reached the Maritime Commission, subordinate officials of the State Department had determined that the sailing of the Colonel Johnson had to be prevented, at least until such time as an authoritative definition of policy could be had. They had found no satisfactory means by which to accomplish their objective. Inquiries directed to the Treasury Department had produced the following advice:
* * * The United States Coast Guard has no prime interest in the matter [preventing the sailing of the Colonel Johnson] except when directed by the Customs Service to carry out orders to seize or to prevent the sailing of any vessel * * * when such sailing is in contravention of United States statutes. * * *
*127 * * * when a vessel complies with United States statutes as to registration, certification, tonnage, seaworthiness, title, and all other matters applicable to clearance, and where there is no violation of United States statutes, the Collector of Customs is obligated by law to allow the sailing of that vessel. * * *
26. At the time of the determination to prevent the sailing of the vessel the State Department had before it (1) general information concerning the nature and extent of the traffic in illegal immigrants; (2) evidence indicating clandestine participation in the traffic by Americans; (3) the reports relating to the Weston Trading Company, plaintiff, and Captain Ash, as summarized in finding 21; and (4) the statement of one of the Warfield seamen, made after his return to the United States from the ill-fated voyage of the Exodus 19fi7, to the effect that, because of his interest in the Jewish homeland in Palestine, he had volunteered his services to Kieve Skidell (who was an officer of Weston Trading Company) ; that Skidell had referred him to Captain Ash; that Ash had told him that there was a ship in Baltimore which was being prepared for the illegal transportation of Jewish people to Palestine; that Ash had had him signed on that vessel (the Ulua, the first ship sent out by the Weston Trading Company) as an ordinary seaman; and that he had thereafter been on one ship after another that was engaged in the traffic for a period of nearly one year (September 1946 to July 1947).
27. In the course of intragovernmental conferences concerning the Colonel Johnson, an attorney on the staff of the Maritime Commission told an Assistant to the Legal Adviser of the State Department that the Maritime Commission had authority, under the terms of the Shipping Act of 1916, to impose conditions upon its approval of the transfer of a vessel to foreign ownership or flag. After a telephone call from the Under Secretary of State, the Chairman of the Maritime Commission formally inquired of the State Department as to its views regarding the transfer. Those views were expressed in a letter dated October 30, 1947, wherein the Legal Adviser “for the Secretary of State” requested that—
*128 * * * the approval of the application for the transfer of this vessel to a foreign flag may be postponed * * *.
Thereafter, the Maritime Commission withheld approval of the transfer until released from the “postponement” by the Department of State.
28. No advice was given to plaintiff by the Maritime Commission concerning his application for transfer. His information that approval would not be forthcoming as a matter of course was gleaned from the questions put to him by agents of the Internal Eevenue and the Federal Bureau of Investigation, from inquiries directed to personnel aboard the vessel, from the presence of Coast Guard cutters watching the ship, and from the efforts of his attorney to communicate with the Maritime Commission by letter and telephone.
29. (a)' On November 21, 1947, plaintiff and his attorney called at the offices of the Maritime Commission to make inquiries. They were referred to the State Department, where an Assistant Legal Adviser listened to their statements and then referred them to the First Secretary of the British Embassy, to whom they repeated their statements. Plaintiff and his attorney were given assurances of sympathetic consideration by the Assistant Legal Adviser and the First Secretary. In the meantime, communications on the subject were exchanged by the British Embassy and the State Department.
(b) On this occasion plaintiff told the Assistant Legal Adviser that the Botterdamsche Lloyd had agreed to accept the agency to operate the Colonel Johnson in the coastal trade in European Atlantic and Mediterranean waters, and that he was willing to give all possible assurances that the boat would not be used in the illegal Palestinian traffic. The Assistant Legal Adviser asked for an affidavit. Plaintiff furnished the affidavit on November 26 and stated therein, “I hereby furnish personal assurance that the operations of this vessel will be conducted in the most correct and legal manner, and will not be contrary to the interest of any foreign government.”
30. On January 22, 1948, the Under Secretary of State “* * * made a firm policy decision,” the substance of which follows:
*129 The State Department will not approve transfer * * * unless the owners * * * enter into a charter party with * * * [a] * * * firm of undoubted integrity, giving it full control over the operation of the ship, and providing against use of the ship in the Palestine immigration trade or sale to a 3rd party.
The State Department adhered to the policy until the British indicated in May 1948, that they had no further interest in the vessel.
31. By this time (January 1948) plaintiff had spent on the vessel much more than he had originally contemplated. Most of these extra sums had been spent (or obligated) to condition the ship for what appeared to plaintiff to be bright prospects for its profitable operation. He had put off some of the vessel’s creditors, in anticipation of an early sale or a down payment on charter hire. As time wore on and the anticipated realization of funds was further postponed by inability to get a flag for the vessel, the requisite cash outlays were beginning to tax his resources. It was in January 1948 that he bought out the interests of the syndicate he had formed in June, giving notes for $9,000 to each of the $6,000 participants. And to meet other expenditures he borrowed $35,000 from one Herman Morris.
32. On January 23,1948, the decision of the State Depart: ment was forwarded to plaintiff.
33. (a) Immediately upon being advised of the State Department’s decision plaintiff executed a power of attorney to Hans Kahn to negotiate with two Dutch companies “looking towards the chartering on a bareboat basis for a period not to exceed six (6) months of the * * * Ooíonél * * * Johnson” subject to terms prescribed. When Kahn -undertook the negotiations, he was advised that the required safeguards would have to be cleared with the Netherlands Ministry of Shipping through the American Embassy at The Hague. By letter dated February 3,1948,. plaintiff requested an Assistant Legal Adviser of the State Department to forward the necessary instructions to the American Embassy at The Hague. The instructions were forwarded by telegraph on February 4S1948.
(b) On February'16,1948, plaintiff’s attorney advised the Assistant Legal Adviser of the State Department that Kot- *130 terdamsche Lloyd was unwilling to undertake a charter, but would act as agent, and undertook in the letter to point out the differences between a charter and án agency agreement.[14]
(c) On February 25, 1948, the Assistant Legal Adviser replied that, according to advices received from the American Embassy at The Hague, the Netherlands Ministry of Shipping was “* * * not authorized to sign a formal guarantee that the vessel will not be used in the illegal immigration trade into Palestine or that it will not be sold to a third party prior to the time the vessel has reached a Netherlands port * * The letter closed with advice that a charter was essential to provide the assurances required by the State Department.
34. During March, April, and May 1948, efforts were continued by the Kahns to work out an arrangement upon which they could agree with plaintiff and which would satisfy the requirements of the State Department.
In the course of discussions between plaintiff and the Kahns, plaintiff at one time sought to terminate the negotiations, telling the Kahns that they were persona non grata to the State Department. Hans Kahn and his attorney took the matter to an Assistant to the Legal Adviser of the State Department, with whom they also discussed the details of the proposed charter to the Kahn Shipping and Trading Company. Kahn’s attorney was requested to put the substance of the conversation in letter form. He did so, by letter dated April 12,1948, addressed to the Under Secretary of State, with copy to the Assistant to the Legal Adviser. The letter specifically asked whether or not the Kahn Shipping and Trading Company was acceptable to the State Department as a charterer of the Oolonel Johnson. The attorney understood the reply he received to mean that the Kahn firm was acceptable. Hé so reported to plaintiff, who thereupon resumed negotiations with the Kahns and renewed his efforts (by letter dated May 5, 1948, to an Assistant Legal Adviser of the State Department) to obtain State Department approval of the transfer of the vessel to the Panamanian flag. *131 He enclosed a copy of the proposed charter between Brown-sam Company and the Kahn Shipping and Trading Company.
35. On May 7, 1948, the State Department was advised by airgram from the American Embassy at Port au Prince that the Haitian Government had been approached with a proposition to buy the Colonel Johnson. The Department replied by airgram on May 19,1948, that it had no objection to the proposed sale.
36. (a) On May 13,1948, a memorandum was addressed to the Under Secretary of State by the Division of Near Eastern Affairs which advised:
* * * Mr. Derecktor has now proposed the bareboat charter * * * of the vessel to Netherlands interests (Kahn Shipping and Trading Company). While there is still slight reason for suspicion of the Kahn interests as they have not previously engaged in the shipping business, investigation by our Mission at The Hague has not been unfavorable. Furthermore, the British have now withdrawn their objection to the transfer of the vessel in view of their imminent surrender of the mandate, although they express the belief that there is a possibility that the vessel might be used for the transfer of immigrants from Black Sea ports. This could be met by excluding these ports from the ones to be visited under the charter.
It is felt that the overall picture is now such that the Department cannot continue to justify interposition of objections to the transfer of the vessel.
The recommendation of the memorandum follows:
That the Maritime Commission be informed that the State Department no longer objects to the transfer of the vessel provided that Mr. Derecktor carries out the proposed charter to Netherlands interests, and that the charter provides that the ship will not call at Black Sea ports or transport illegal immigrants therefrom.
37. The recommendation was approved by the Under Secretary. On May 20,1948, the Assistant to the Legal Adviser advised the Maritime Commission of the decision.
On the preceding day, the Assistant to the Legal Adviser wrote plaintiff:
*132 * * * this Department will interpose no objection to the transfer of the SS. Colonel Frederick C. Johnson to the Panamanian flag in order that it may be chartered to the Kahn Shipping and Trading Company in accordance with the proposed charter transmitted with your letter, provided that the charter further contains a provision that the ship will not call at Black Sea ports or transport immigrants therefrom.
38. (a) On May 20, 1948, the Assistant to the Legal Adviser of the State Department wrote to the Maritime Commission’s Chief, Bureau of Operations:
* * * the * * * proposed charter with the Kahn Shipping and Trading Company (Netherlands) * * * is considered satisfactory to this Department provided it contains a provision that the ship will not call at Black Sea ports and transport immigrants therefrom. * * *
(b) On May 21, 1948, the Secretary of State advised the American Embassy at The Hague that the Department had no objection to the charter to Kahn Shipping and Trading Company, and requested that the Netherlands Ministry of Shipping be so advised.
(c) On May 21,1948, plaintiff’s attorney wrote the Maritime Commission that plaintiff agreed that the charter would contain the provision that the vessel would not be operated in trade with ports on the Black Sea.
(d) On June 22, 1948, the Maritime Commission ordered that “* * * approval * * * of the sale * * * to an alien * * * with transfer to Panamanian registry and flag, be * * * granted * * The only condition specified was that the sale alien and transfer to foreign registry and flag should be effected within six months.
(e) On June 23, 1948, the Maritime Commission’s Chief, Bureau of Operations, notified plaintiff’s attorney of the approval, by telegram—
* * * Provided * * * that before issuance of formal transfer order in evidence of such approval, Commission be furnished with certified copy executed charter party between * * * present owner of vessel, and Kahn Shipping and Trading Company which charter party shall contain provision that vessel will not call at Black Sea ports and transport immigrants therefrom.
*133 (f) On June 28, 1948, plaintiff’s attorney forwarded to the Maritime Commission a certified copy of the executed charter between plaintiff and the Kahn Shipping and Trading Company. The charter contained the following provision:
The vessel shall be employed in carrying lawful merchandise and passengers in such lawful trades between safe port and/or ports European, Mediterranean and adjacent waters. It is specifically agreed that the vessel will not call at Black Seaports and transport immigrants therefrom.
(g) On June 30,1948, the Maritime Commission forwarded to plaintiff’s attorney a certified copy of its transfer order. A copy was sent to the Collector of Customs at Norfolk.
39. (a) On July 14, 1948, plaintiff forwarded to Captain Weiss (of Alcoa Steamship Company), at Norfolk, the provisional certificate of Panamanian registry and photostatic copies of the Maritime Commission’s transfer order, Customs Service clearance papers, and bill of sale of the vessel from plaintiff to Brownsam Company. In the bill of, sale provision was made to change the name of the .vessel from Colonel Frederick C. Johnson to Derecktor. Plaintiff further advised that the Panamanian Consulate had requested Bureau Veritas to complete the classification.
(b) On July 16, 1948, the Panamanian flag was hoisted on the vessel by the Panamanian Consul. The ship was rechristened the Derecktor a few days later.
(c) On July 30,1948, classification of the vessel was completed by Bureau Veritas.
(d) Some time in August 1948, the Derecktor was moved from Norfolk to New York.
40. The charter of the vessel to the Kahn Shipping and Trading Company was abandoned in August 1948, by plaintiff and the Kahns, because of the latter’s inability to effect exchange of guilders into dollars in amounts sufficient to meet the terms of the charter.
41. Within two or three weeks after the abandonment of the Kahn charter, plaintiff sold all the stock of the Brown-sam Company to the American-Israeli Company. This stock *134 transfer carried with it the corporation and the vessel.[15] The consideration for the transfer was $306,600, of which $300,-000 was for the vessel and $6,600 was for stores and fuel.
42. Plaintiff, with the aid of Captain Ash, had negotiated the sale to American-Israeli Company at a price of $325,000 for the vessel. In some maimer not explained by the evidence, Herman Morris (from whom plaintiff had borrowed $35,000 in January 1948, finding 32) and his attorney (who had represented Hans Kahn at the time of his call at the State Department, finding 35) were either connected with the American-Israeli Company or were conversant with and influential in its affairs, or made plaintiff think they were so connected or influential. In any event, Morris and his attorney used their knowledge of the pending transaction between plaintiff and American-Israeli, and of plaintiff’s financial situation in regard to the vessel, to require plaintiff to repay the loan Morris had made to plaintiff plus a bonus of $5,000. The American-Israeli Company took advantage of the situation to demand and obtain a reduction of $25,000 in the price of the vessel.
43. There had been an active demand for passenger vessels of the size and type of the Colonel Johnson during the spring and summer of 194T, for use in the Mediterranean and in coastal and inland waters of Europe and parts of Asia,. The demand carried over into the fall of 1947, and extended into 1948, but with diminishing vigor. The fair and reasonable market valué of the Colonel Johnson (assuming it had been in class according to Bureau Veritas standards and provided with a Panamanian flag) was: (1) in the period from July to October 1947, $375,000; (2) in the period of November-December 1947, $350,000; and (3) in the period of August-September 1948, $325,000.
44. During 1946 and 1947 the Maritime Commission, in its consideration of applications for approval of transfers foreign of vessels sold by it, from time to time and depending upon the circumstances of individual cases, asked the Department of State, and sometimes the Navy Department, for *135 their views concerning the proposed transfers. It is not established by the evidence (1) that the Maritime Commission sought the views of other agencies or departments of the Government in connection with every such application for transfer foreign; or (2) that the Maritime Commission sought the views of any other agency or department in connection with any application for transfer foreign of a vessel sold by it under the terms which were contained in the invitation for1 Mds on the Colonel Johnson, except in relation to the Colonel Johnson.
45. (a) Approval of plaintiff’s application for transfer of the vessel to Panamanian ownership and flag was withheld by the Maritime Commission for a period of eight months, from November 1,1947, to June 30,1948.
(b) If the Maritime Commission had not withheld its approval of the transfer, the vessel would have been available (in class and with flag) for use or sale by plaintiff not later than November 20,1947, which had been his target date after the collapse of the Coelho-Abraham negotiations (findings 18 and 22). Because approval was withheld by the Maritime Commission, the vessel was not available for use or sale by plaintiff until July 16, 1948.
(c) The use or sale of the vessel was delayed by the Maritime Commission’s withholding of approval. The period of such delay was from November 1,1947, to June 30,1948, and is hereinafter referred to as the period of delay.[16]
(d) During the period of delay there was a decline in the market value of the vessel, and plaintiff incurred certain expenses which would not have been necessary except for the delay. These items comprise the measure of recovery if plaintiff is entitled as a matter of law to prevail.
(e) The decline in the market value of the vessel during the period of delay was $25,000.
(f) The expenses incurred by plaintiff which were attributable to the period of delay amounted to $56,836.17.*
*136 46. (a) Approval of plaintiff’s application for transfer foreign was withheld by the Maritime Commission at the request of the State Department, whose officials considered such withholding to be necessary in the interest of and support for the implementation of the foreign policy of the United States.
(b) The information on which the State Department acted, in requesting that approval of the transfer be withheld, was such as reasonably to support the conclusion that the Colonel Johnson might be destined for the illegal Jewish traffic and that, as long as the conditions which prompted the request for the withholding should obtain, the ship should not be permitted to sail unless satisfactory guarantees were given that it would not be used in the proscribed traffic.
(c) The State Department specified the steps to be taken by plaintiff to provide a satisfactory guarantee that the ship would not be used in the proscribed traffic. The requirements so specified would have permitted the use of the vessel on a time or bare boat charter and precluded the use of the vessel under an agency agreement and the unrestricted sale of the vessel on the world market. Such requirements were reasonable under the circumstances and for the purpose for which they were designed.
(d) It is not established by the evidence that plaintiff ever demanded or asked (1) to be advised of the nature and content of the information upon which the State Department’s suspicion was founded or (2) for an opportunity to be heard and to present evidence to refute or explain the evidence in the. hands of the Department.
(e) Plaintiff indicated throughout his conversations with representatives of the State Department his willingness to try to reach agreement with those officials upon means by which to provide a guarantee that the ship would not be used in illegal trades and to comply with the requirements thereof. As time passed, and the difficulties of arranging a satisfactory guarantee became more apparent, plaintiff protested vigorously the financial losses being suffered by him and which he attributed to the withholding of approval of his application for transfer of flag.
*137 CONCLUSION OK LAW
Upon the foregoing findings of fact, wMcli are made a part of the judgment herein [No. 50018], the court concludes that as a matter of law the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 The mandate was approved by the Council of the League of Nations on July 24, 1922. The United States consented “* * * to the administration of Palestine by His Britannic Majesty, pursuant to the Mandate *'* *” in the Convention of December 3, 1924, between the United States and Great Britain.

 All references to any phase of the Jewish migration as “Illegal” which may appear hereinafter are Intended to reflect only the terminology of the British Foreign Office and the United States Department of State. The legal accuracy of the phrases Is not material to the case.

 The applicable provisions of the Shipping Act, 1916, Included sections 9, 37, and 41. See 46 U. S. C. 808, 835, and 839. The section last cited provides in part: “Whenever by section 808 or 835 of this title the approval of the commission is required to render any act or transaction lawful, such approval may be accorded either absolutely or upon such conditions as the commission prescribes. Whenever the approval of the commission is accorded upon any *120 condition a statement of such condition shall be entered upon its records and incorporated in the same document or paper which notifies the applicant of such approval. * * *”

 All three of the vessels named above were owned by the Weston Trading Company and all found their way ultimately Into the traffic in Jewish immigrants. Another of Weston’s vessels, the Vina, had cleared Baltimore for Marseilles, France, in October 1946, and was reported at Havre on January 28, 1947, carrying 600 Jewish immigrants to Palestine. It was later intercepted by the British.

 The Alabama precedent received added emphasis In the office of the Legal Adviser of the State Department as the volume and detail of reports of participation in the traffic by Americans and the pressure from British authorities upon the American Government to stop such participation increased.

 Since the $3,000 participant was plaintiff's son-in-law and since plaintiff maintained personal control over the investment, It may be Inferred that the unexplained portion of the syndicate was absorbed in a family transaction.

 It is axiomatic in the shipping industry that the cost of commissioning and operating a ship under foreign flag is less than under the American flag. Because of these facts, and because of restrictions upon the operation under the American flag of a vessel such as the Colonel Johnson, the resale of the vessel at a profit was virtually dependent upon its transfer to foreign registry.

 “When the Weston Trading Company purchased the President Warfield (finding 4), it applied to the Maritime Commission for transfer to the Honduran flag. The Commission consented ■without comment. However, the Honduran consul in New York would not accept the vessel for Honduran registry until a sworn statement was given by Weston’s president, Captain Ash, that the vessel would “not be used for running the British blockade into Palestine for the purpose of carrying refugees.” The British authorities knew of this affidavit when the Bwodus 1947 was captured. They used- it in later conversations with the State Department.

 In accordance -with diplomatic usage communications between Governments remain classified unless release is authorized by both sender and recipient. In this instance the British Government declined to consent to release of the letter but did agree to a paraphrase of it prepared by the State Department. Much of the evidence submitted by defendant was based upon “sources” of the State Department, meaning classified information which the Department de1 dined to produce in original form. "

 This is the first specific mention of the Oolonel Johnson by the British.

 This was the specific request upon which State Department policy finally crystallized, more than three months later.

 Since tfie Maritime .Commission had certified that ownership had passed to plaintiff on May 20, 1947, the six months during which plaintiff intended to hold the investment would expire on November 20.

 Neither plaintiff nor the Assistant Legal Adviser of the State Department had understood the clear implications of the specification of “* * * a charter party giving * * * full control * *

 In November 1948, the vessel was sold to an agency of the State of Israel, and was renamed the Galilah. In January 1949, the Galilah passed through the port of Istanbul, Turkey, bound for Constanza, Rumania, on the Black Sea, and returned through Istanbul with 1,326 passengers bound for Haifa, Israel.

 “It ■would be more accurate to date the delay in the use or sale of the vessel from November 20, 1947, to July 16, 1948. The period from November 1 to July 1' is accepted because the parties adhered to those dates in the trial of the action. Differentiation at this point would unduly complicate the evidence relating to damages.

 Amended September 22, 1954.